The FOLGER COFFEE COMPANY

v.

M/V MEDI SUN, etc., et al.

Civ. A. Nos. 78–695, 78–696.

United States District Court,
E.D. Louisiana,
New Orleans Division.

July 8, 1980.

Machale A. Miller, and Stanley McDermott, III, New Orleans, La., for plaintiff.

M. D. Yager, Edward F. LeBreton, III, La., Gustave A. Manthey, Jr., New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

In these consolidated cases, plaintiff, Folger Coffee Company (hereinafter, "Folger"), seeks to recover for cargo that sustained damage while stored in transit sheds in the Port of New Orleans. Defendants are the general agent of the carrier, Hansen & Tidemann, Inc., the Board of Commissioners of the Port of New Orleans (hereinafter, "Dock Board"), and the shipping interests. In civil action 78–695, the shipping interests are Ozean-Linie G.m.b.H., Hugo Stinnes, Ozean/Stinnes-Linien Gemeinschaftsdienst, and Atlantic-Mediterranean Shipping Corporation (hereinafter, "Medi Sun interests"); and in civil action 78–696, these interests are Armenent Deppe N.V. and Compagnie Maritime Belge (Lloyd Royal) S.A. (hereinafter, "Breughel interests").

Subsequent to trial on the issue of liability, all parties have filed post trial memorandum, and, after a review of same, the court makes the following findings of fact and conclusions of law:

1. M/V Medi Sun docked in the Port of New Orleans on May 5, 1977, and discharged bags of coffee, covered by Bills of Lading numbers 1, 2, 4, 5 and 6 for, respectively, 300 bags, 500 bags, 250 bags, 250 bags and 500 bags. Arrival notices of the delivery were sent to Folger on April 30.

2. Delivery of the above described bags of coffee was taken by Hansen & Tidemann, Inc., the general agent for the Medi Sun interests. Hansen & Tidemann directed that the coffee be stored in a transit shed at the St. Andrew Street wharf in the Port of New Orleans, a facility which they (Hansen & Tidemann, Inc.) used pursuant to an agreement with the Dock Board.

3. On May 10, 1977, the task of "clearing the goods" through Customs and the Food and Drug Administration (hereinafter, "FDA") was begun. Clearance must be obtained by these agencies before the goods can be removed from the dock. Consumption entries were made on May 10, but Customs clearance was not obtained until May 19. An error in filling out the entry forms by Folger personnel added 6–7 days to the normal 2–3 day lag time. On May 23, the FDA released all five lots from the Medi Sun.

4. Arrival notices with respect to the M/V Brueghel were sent on May 27, and that vessel docked in the Port of New Orleans on June 3, 1977. The Brueghel, like the Medi Sun, contained consignments of coffee bound for Folger. As in the case of M/V Medi Sun, Hansen & Tidemann took delivery of the cargo as agent for the vessel interests and directed it to be stored in the same general area where the coffee bags from the Medi Sun were stored. There were four Bills of Lading covering the coffee aboard the Brueghel: Bills of Lading numbers 1, 2 and 3 were for 250 bags, and Bill of Lading number 4 covered 300 bags. The process of "clearing" that shipment through Customs and the FDA, as described

above, was completed without incident on June 14 for Bills of Lading 3 and 4, and on June 17 for Bills of Lading 1 and 2.

5. The first time that the coffee from either vessel was sampled or checked, other than an initial routine Overage, Shortage & Damage report by Hansen & Tidemann, was on May 13, 1977. At that time, the drayage company hired by Folger, Neeb Kearny, inspected and sampled four of the five lots of coffee from the Medi Sun. It was found to be in acceptable condition. On May 18, the remaining lot was sampled, and it, too, was in acceptable condition. From that date until June 8, 1977, there were no other specific checks on any of the lots of coffee. However, there were periodic (yet cursory) inspections of the general wharf area by representatives of Folger, the Dock Board and Hansen & Tidemann during that time span.

6. On June 8, 1977, Neeb Kearny was sent by Folger to weigh the coffee that had been discharged from the Medi Sun. At that time, the bags covered by Bills of Lading 4 and 5 (a total of 500 bags) were found to be defiled by rat excrement. The remaining coffee from the Medi Sun (lots 1, 2 and 6) were still in satisfactory condition. Neeb Kearny reported this condition to Folger, and they, in turn, reported the situation to the FDA. The agency, in response, requested that none of the coffee from the Medi Sun be moved until they conducted an inspection.

7. The inspection was commenced by the FDA soon after notification of the rat defilement, and concluded on June 21. During that time span (specifically on June 16), Folger was given permission by the FDA to remove lots 1, 2 and 6 since those lots had been inspected and were found to be uncontaminated. Thereafter, Folger apparently gave instructions to Neeb Kearny to dray the coffee from the wharf, but there was no attempt to dray it for several more days. When preparations to dray lots 1, 2 and 6 finally were completed, it was then discovered that these lots had also become rodent defiled.

8. Though Folger requested that Neeb Kearny dray the coffee, they failed to indicate in any way that there was a danger of contamination, and, as a result of this, the coffee remained on the wharves for several more days, during which lots 1, 2 and 6 became defiled.

9. Then, on June 21, Neeb Kearny was instructed by Folger to dray the coffee that had been discharged from M/V Brueghel. Before the draying commenced, this coffee was, also, found to be rodent defiled. The situation was reported to Folger by Neeb Kearny and, thereupon, by Folger to the FDA. A second inspection by that agency was instituted. It lasted for a period of 5 days (June 23–28), and it was even more detailed and comprehensive than the inspection of the coffee from M/V Medi Sun. This second inspection by the FDA confirmed that many bags from both shipments were rodent defiled.

10. The coffee from M/V Brueghel was stored in the same transit shed where the coffee from M/V Medi Sun was stored and, as such, was placed in further danger of contamination. Hansen & Tidemann took no action to make Folger aware of this fact, nor did they take any affirmative action to protect the "Brueghel coffee" from June 8 onward, notwithstanding the fact that certain portions of the "Medi Sun coffee" were, from that date onward, known to be rodent defiled.

11. From June 28 until July 21, no action was taken by any of the parties with respect to relocating or reconditioning the coffee or resolving the problem in any way. Each party waited for the other to do something, and, finally, on July 21, 1977, the coffee was seized by the FDA. (Civil action 77–2257.) On August 26, the coffee was released by the FDA for reconditioning.

12. Hansen & Tidemann acted as general agent for the vessel interests and, as such, served as the go-between or middle man between the carriers and the ultimate recipient of the cargo. Paid by the carrier to assume this vital role in the flow of sea-going commerce, Hansen & Tidemann accepted delivery when the cargo was discharged from the vessels, made an Overage, Shortage & Damage report on the incoming cargo, selected the storage location for the cargo and directed the removal of the cargo to the storage area.

13. Under provisions of the applicable bills of lading, Hansen & Tidemann elected to store the coffee in transit sheds which they occupied on the wharves. This action was in accordance with standard practice.

14. Hansen & Tidemann had a "first call on berth privileges" with respect to certain areas located on the St. Andrew Street and Celeste Street wharves. This preferential right to specific wharf areas is not uncommon in the allocation of wharf space in the Port of New Orleans. Though agents, or others, desiring space are required to apply for berthing privileges in every instance of use (and it is possible that space on the Hansen & Tidemann area could be assigned to entities other than Hansen & Tidemann), the area over which Hansen & Tidemann had "berth privileges" was seldom, if ever, used by others. There is no testimony or indication that Hansen & Tidemann was ever denied space in their preferred area, and Hansen & Tidemann could and did rely on the wharf space it had first call privileges on as their own in terms of availability, planning and storage. Hansen & Tidemann also maintained a small office in the area over which it had first call privileges and employed persons to maintain and clean that wharf area. A Hansen & Tidemann sign was placed so that it was visible to those in the area.

15. Day to day cleanup responsibilities of the wharf area were also under the control of Hansen & Tidemann. In recognition of this responsibility, Hansen & Tidemann employed a full-time maintenance man (a cooper), who specifically had the duty of cleaning and maintaining the dock areas under Hansen & Tidemann's control. Hansen & Tidemann also hired extra workers on occasion to clean and maintain the areas over which they had "berth privileges" when the cooper alone was insufficient.

16. Hansen & Tidemann, thus, essentially exercised control over the wharf area

covered by their preferential agreement with the Dock Board. The housekeeping condition of that area was poor: Unclaimed and/or damaged cargo had accummulated for an indefinite period of time and became an attractant to rodents by providing sources of food and harborage; garbage was uncollected; unrepaired access points into the transit sheds enabled harbor-located rodents to enter. Yet, no baiting or trapping system was in effect. A generally unclean, unkept wharf existed in the Hansen & Tidemann area.

17. The above noted facts were material in causing the rodent defilement of the coffee off loaded from M/V Medi Sun and M/V Brueghel.

18. The Dock Board is the governmental body engaged in the operation and control of the port. Under 46 U.S.C. § 816, 46 C.F.R. 533, it is required to file its Dock Department Tariff with the Federal Maritime Commission, and, accordingly, it is required to operate the port pursuant to the provisions of the tariff. The "first call on berth" arrangement described above, the rate structure for wharfage and demurrage charges, and all other specifics that relate to the operation of the port are found in the tariff. Particular sections of the tariff deal with exclusions from liability. Specifically, the tariff provides:

"To accomodate the shipping and commerce through this port, the Board merely provides and makes available wharves and other facilities to vessels, their owners, charterers and agents, or other persons, for their use and performs no services of any kind. The parties assigned to the use of such facilities shall perform any and all services and conduct all operations necessary in connection with the berthing and mooring of vessels . . . and in connection with the receiving, delivering and handling of cargo or other property, or other use thereof, by such assignees upon or at said wharves and other facilities. In all cases, the care, custody and control of such vessels, cargo, or other property shall at all times be and remain in the vessel, her owners, charter-

ers and agents, and in no case shall the assignment of a berth, wharf or other facility be deemed or construed as placing such vessels, cargo, or other property in the care, custody or control of this Board."

Dock Department Tariff, FMC T–No. 1, p. 23.

"Each shipper or receiver of cargo, or those acting for them, must protect such cargo from loss or damage from any cause whatsoever, including but not limiting to . . . rodents, . . . .."

Dock Department Tariff, FMC T–No. 1, p. 23a.

19. The Dock Board has control over repair work on port structures and maintains a crew of men to inspect and, when necessary, make repairs. The Dock Board was slow to make repairs, and was months behind in its completion of necessary repairs to the pertinent areas which were clearly in need thereof.

*Conclusions of Law*

1. A deposit, in general, is an act by which a person receives the property of another, binding himself to preserve it and return it in kind. The deposit is essentially gratuitous, although compensation may be given. La.C.C. Article 2929. A compensated depositary is one against whom the obligation of preserving the property is rigorously enforced. *Coe Oil Service v. Hair,* 283 So.2d 734 (La.1973); *United States Fidelity & Guaranty Co. v. Dixie Parking Service,* 262 La. 45, 262 So.2d 365 (1972).

2. The deposit is perfected by the delivery of the thing deposited. La.C.C. Article 2930. The depositary must use the same diligence in preserving the property that he uses for his own. He is not answerable for the accidental loss or for deterioration not effected by his act. However, once the existence of the deposit is established and loss of or damage to the property while deposited, a presumption is raised that the loss resulted from lack of due care on the depositary's part, and the burden is then on the depositary to exonerate himself from fault. *Coe Oil Service v. Hair,* supra; *Alex*

*W. Rothschild & Co. v. Lynch*, 157 La. 849, 103 So. 188 (1925).

3. Delivery is perfected "when the owner has carried or sent the thing to the depositary, and the latter knowing that the thing had been sent, has not refused to receive it." (La.Civil Code art. 2933.)

4. A compensated bailee with the obligation to preserve the bailed property need not be specifically paid storage fees. Instead, other economic benefits arising from the bailee-bailor relationship may suffice. As stated in *Coe*, supra:

" . . . compensation for accepting deposit of a thing need not consist of a storage fee, but may, as here, consist of some other economic advantage received by the depositary as part of the consideration for accepting the deposit." (at pg. 738)

5. Hansen & Tidemann were the bailees of the Folger coffee stored on the St. Andrew Street wharf. Delivery took place consistent with article 2938 when Hansen & Tidemann accepted the cargo upon discharge from the vessels and directed that it be stored in their transit shed. The coffee remained in the agent's control assigned to the agent's wharf area.

6. The bailment was compensated in spite of the fact that Hansen & Tidemann received no fees for storage. Hansen & Tidemann, as the carrier's general agent, is in the business of taking delivery of discharged goods and storing these goods until they are removed. They are compensated for relieving the carriers of their dockside responsibilities, and for providing an interim storage area for cargo. When they chose not to exercise their option to end their responsibility by removing the stored goods to a government warehouse, they implicitly accepted the continuing responsibility of providing proper storage.

7. Bailee or depository status having been established, the plaintiff-bailor need only prove that there was a bailment, and that damage occurred during the bailment. After proof of those facts, a presumption arises that the injury was caused by the depositary's breach of his obligation of care. Defendant-depositary must then move forward with evidence to exonerate itself. *Coe*, supra; *Guillot v. Kaplan Farmers Co-op, Inc.*, 352 So.2d 402 (La.App., 3rd Cir., 1977).

8. Hansen & Tidemann failed to meet this burden with respect to the coffee covered by Bills of Lading 4 and 5 of the Medi Sun.

9. With respect to the other three lots of coffee from the Medi Sun (Bills of Lading 1, 2 and 6), Folger must be barred from recovery for any cost of reconditioning these consignments because of their failure to expeditiously remove same.

Specifically, Hansen & Tidemann has failed to meet its burden of exoneration as to the coffee covered by Bills of Lading 4 and 5 of the Medi Sun as well as all the coffee discharged from the Brueghel (a total of 1550 bags). Folger's contributory negligence bars recovery with respect to Bills of Lading 1, 2 and 6 from the Medi Sun (1300 bags).

10. The Dock Board was not a bailee. Thus, proof of negligence is necessary to create liability on their part. Folger has failed to carry that burden notwithstanding the fact that the record indicates a deficiency insofar as the Dock Board is concerned with respect to its attention to the care and maintenance of the pertinent areas.

11. The shipping interests, more particularly described in the opening paragraph herein, are not liable. They fulfilled their obligations to Folger by making all necessary arrangements with Hansen & Tidemann for the handling of the cargos hereinabove described.

12. The amended findings of fact and conclusions of law handed down by Judge Gordon in *Folger Coffee Company v. M/V Novelist, etc., et al* (civil action 74–3363), dated June 17, 1980, essentially controls these consolidated cases insofar as the liability of Hansen & Tidemann is concerned and would apply in all respects but for the

contributory negligence of Folger with respect to lots 1, 2 and 6 of the Medi Sun shipment.

13. The court is obliged to note and, further, to comment upon the fact that both Hansen & Tidemann and Folger did less than good management would require insofar as the time period June 28 to August 26 is concerned. Indeed, the situation may well have worsened markedly during that time although there is no clear evidence to indicate this, and the ultimate determination of liability and responsibility must be made with respect to the chronological series of events which took place prior to this final time span.

14. Thus, in the court's view, this matter is susceptible to ultimate resolution without the necessity of further proceedings if the parties (that is, Folger and Hansen & Tidemann) can agree and, thus, stipulate on the fair cost of reconditioning the total coffee shipments that were aboard M/V Medi Sun and M/V Brueghel. If that figure is susceptible to stipulation, then Hansen & Tidemann is liable to Folger for 1550/2850ths of that cost or, stated another way, they are responsible to Folger for the reconditioning costs of 1550 bags out of the total shipment of 2850 bags.